******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* AMELIA RHODES
## (SC 20070)

Palmer, McDonald, D'Auria, Mullins, Ecker,
Vertefeuille and Prescott, Js.*

*Syllabus*

Convicted of, among other crimes, criminal possession of a firearm and having a weapon in a motor vehicle, the defendant appealed. The defendant had been driving a car with a passenger, S, a drug dealer with whom the defendant had a long-standing relationship. They drove around for approximately forty-five minutes, stopped at a gas station-convenience store, and then drove for another forty-five minutes. The defendant then stopped the car in the lane of travel as they approached a large, outdoor social gathering, and S exited the car and fired multiple gunshots from a gun he had been carrying. S then reentered the car and instructed the defendant to drive. Police officers witnessed the shooting, and a high-speed police chase ensued, after which the defendant and S were ultimately apprehended. On appeal, the defendant claimed that the state failed to prove beyond a reasonable doubt that she possessed a firearm and, therefore, that there was insufficient evidence to sustain her conviction of criminal possession of a firearm. The defendant also contended that there was insufficient evidence to support her conviction of having a weapon in a motor vehicle. *Held*:

1. There was sufficient evidence from which the jury reasonably could have found that the defendant constructively possessed the firearm that S used in the shooting, as the record contained sufficient circumstantial evidence that the defendant knew that the firearm was in the car and that she was in a position to and intended to control the firearm, and, accordingly, this court upheld the defendant's conviction of criminal possession of a firearm: the jury reasonably could have inferred that, by the time of the police chase, the defendant knew that the firearm was in the vehicle, the defendant likely knew that S was a drug dealer and that he, therefore, often carried a gun, the fact that the defendant was driving and thereby controlling the car suggested that she was able to and intended to control the firearm, the defendant's attempt to flee from the police after the shooting indicated a consciousness of guilt stemming from her knowledge of and intent to exercise control over the gun, the jury reasonably could have inferred that the defendant and S were not just close friends but willing partners in a joint criminal venture, and, in view of the fact that there was no evidence indicating that the firearm was anywhere other than in the area of the front seat, the jury reasonably could have inferred that she was physically in a position to exercise control over it; moreover, there was no merit to the defendant's contention that, because S testified that he had actively sought to conceal the firearm on his side of the car by sitting on it or by keeping it between his seat and the passenger's side door, her conviction of criminal possession of a firearm could not stand, as the jury was not required to credit the testimony of S, who lacked credibility and whose testimony was at odds with other evidence presented and the relationship between S and the defendant, whose interests were aligned; furthermore, this court declined to adopt the defendant's position that, because S allegedly had actual possession of the firearm, she could not have constructively possessed that firearm.

2. The defendant could not prevail on her claim that there was insufficient evidence to support her conviction of having a weapon in a motor vehicle on the ground that the "knowingly has" element of the statute ((Rev. to 2013) § 29-38 (a)) under which she was convicted should be construed to mean "knowingly possesses": constructive possession of a firearm would support a conviction even under the defendant's proposed reading of § 29-38 (a), as constructive possession requires knowledge and control of the object, and, in light of this court's conclusion that there was sufficient evidence that the defendant constructively possessed a firearm in connection with her conviction of criminal possession of a firearm, the defendant also must have knowingly possessed that firearm

for purposes of her conviction under § 29-38 (a); moreover, the jury's finding that the defendant constructively possessed a firearm for purposes of her conviction of criminal possession of a firearm rendered any potential instructional error harmless, the trial court did not commit plain error in applying the law concerning the construction of the term "knowingly has" in § 29-38 (a) that existed at the time of the defendant's trial, and this court declined the defendant's request to exercise its supervisory authority over the administration of justice to resolve an issue of statutory construction and evidentiary sufficiency, as that authority is generally reserved for the adoption of procedural rules.

*(One justice concurring separately; three justices
concurring and dissenting in one opinion)*

Argued September 12, 2018—officially released March 27, 2020**

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of attempt to commit assault in the first degree, carrying a pistol without a permit, having a weapon in a motor vehicle, interfering with an officer, using a motor vehicle without the owner's permission and reckless driving, and, in the second part, with criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the first part of the information was tried to the jury before *Kahn, J.*; thereafter, the court, *Kahn, J.*, granted the defendant's motion for a judgment of acquittal as to the charge of carrying a pistol without a permit; subsequently, verdict of guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission and reckless driving; thereafter, the second part of the information was tried to the jury before *Kahn, J.*; verdict of criminal possession of a firearm; subsequently, the court, *Kahn, J.*, rendered judgment in accordance with the verdicts, from which the defendant appealed. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Michael A. DeJoseph*, senior assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Amelia Rhodes, challenges her conviction of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a)[1] and having a weapon in a motor vehicle in violation of General Statutes (Rev. to 2013) § 29-38 (a).[2] The evidence presented to the jury at her trial showed that she drove an armed passenger, Lamar Spann, around Bridgeport for ninety minutes, including to and from the place where Spann discharged a weapon. The defendant appeals, arguing that there was insufficient evidence to establish that she constructively possessed a firearm under § 53a-217 (a) or that she knowingly had a firearm under § 29-38 (a). We disagree with the defendant and affirm the judgment of the trial court.

As both of the defendant's claims on appeal challenge the sufficiency of the evidence, we first must construe the evidence in the light most favorable to sustaining the verdict and then determine whether, on the basis of those facts and the inferences reasonably drawn from them, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. See, e.g., *State* v. *James E.*, 327 Conn. 212, 218, 173 A.3d 380 (2017). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

With these principles in mind, our review of the record discloses the following relevant facts that the jury could have reasonably found. At the time of the shooting at issue, the defendant and Spann had a relationship going back as many as seven years. Spann had been a drug dealer for much of this time, and, because of the risks involved in that enterprise and the need to coerce payments from customers, he commonly carried a firearm. According to Spann's testimony, the defendant "[m]aybe" knew he was a drug dealer. Between July 29 and August 17, 2013, the two had once or twice gone together to a rental car agency where Spann had rented a black Chevrolet Impala.

On the afternoon of August 17, 2013, Spann left his home, driving the Impala and carrying a nine millimeter semiautomatic handgun that was not equipped with a silencer. At about 4 p.m., he picked up the defendant at her home. At the defendant's request, she drove the Impala while Spann sat in the front passenger seat.

The defendant and Spann were together in the car for nearly all of the next ninety minutes. For the first forty-five minutes, the defendant drove "around" with

no apparent destination. At about 4:45 p.m., they stopped at a gas station-convenience store, and Spann went inside. Surveillance images of him in the store are inconclusive as to whether the gun was on his person or whether it remained with the defendant in the Impala. After Spann reentered the car, the defendant drove for another forty-five minutes. Spann testified that he kept the gun "under [his] lap" or sat on it during this portion of their drive.

At about 5:30 p.m., they approached a large outdoor social gathering near a housing complex on Trumbull Avenue in Bridgeport. The defendant stopped the car in the lane of travel rather than driving toward the sidewalk and stopping there. Spann then exited the car, fired multiple gunshots from the weapon, and reentered the car.

After reentering the car, Spann told the defendant to drive. Unbeknownst to them, however, police officers had been stationed nearby and witnessed the shooting. When the officers attempted to block the Impala with their patrol car, the defendant maneuvered around them and continued along Trumbull Avenue with the officers in pursuit. She proceeded to weave between pedestrians, drive past multiple stop signs without stopping and drive at high rates of speed. After a 1.2 mile car chase, the defendant crashed the car as she approached a highway entrance ramp. Spann testified that, during the car chase, the gun was "on the side of [him] . . . in between the seat and the door."

After the crash, the defendant and Spann fled on foot. The police found the defendant hiding in an unlit sewer in waist-deep water and arrested her. Spann, who initially evaded the police, testified that he disposed of the gun while the police chased him but was arrested after appearing at the Bridgeport police station and falsely reporting that the Impala had been stolen. The police never recovered the gun. Spann pleaded guilty under the *Alford* doctrine[3] to various charges related to this incident and was sentenced. He did not face additional criminal exposure as a result of his testimony at the defendant's trial. Additional facts will be set forth as necessary.

The record also reveals the following procedural history. The state charged the defendant in a two part substitute information with seven offenses stemming from the incident: (1) attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2); (2) carrying a pistol without a permit in violation of General Statutes § 29-35 (a); (3) having a weapon in a motor vehicle in violation of § 29-38 (a); (4) interfering with a peace officer in violation of General Statutes § 53a-167a (a); (5) using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b (a) (1); (6) reckless driving in violation of General Statutes § 14-222 (a); and (7)

criminal possession of a firearm in violation of § 53a-217 (a).

After two days of evidence, the trial court granted the defendant's motion for a judgment of acquittal on the charge of carrying a pistol without a permit, stating that "the court certainly heard evidence from which a jury could conclude that [the defendant] constructively possessed the gun" but not that she had "carried [the firearm] on . . . her person," as required by § 29-35 (a).[4] The jury found the defendant not guilty of attempted assault and interfering with an officer but found her guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving. The jury then separately heard evidence of the defendant's prior convictions for the sale of hallucinogens or narcotics in violation of General Statutes § 21a-277 (a) and stealing a firearm in violation of General Statutes § 53a-212, and found her guilty of criminal possession of a firearm.

The defendant appealed to the Appellate Court, and the appeal was transferred to this court. See General Statutes § 51-199 (c); Practice Book § 65-1. On appeal, the defendant challenges her conviction of criminal possession of a firearm and having a weapon in a motor vehicle.[5] We reject both of these claims.

I

The defendant claims first on appeal that the state failed to prove beyond a reasonable doubt that she "possessed" a firearm and, therefore, that there was insufficient evidence to convict her of criminal possession of a firearm under § 53a-217 (a). She argues that the evidence established only that she and the firearm were in the same car at the same time and that, on the basis of this alone, the jury could not reasonably infer that she possessed the firearm. We disagree and conclude that the record contains sufficient circumstantial evidence, beyond mere proximity, that the defendant knew the firearm was in the car, was in a position to control it, and intended to control it. We therefore conclude that there was sufficient evidence from which the jury reasonably could have found that the defendant constructively possessed a firearm.

"A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 754, 189 A.3d 587 (2018). In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that "no reasonable jury" could arrive at the conclusion the jury did. *State* v. *Terwilliger*, 314 Conn. 618, 660, 104 A.3d 638 (2014). Although "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . .

each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 330 Conn. 187.

## A

### 1

A defendant is guilty of criminal possession of a firearm if (1) the defendant "possesses" a firearm, (2) the defendant is a convicted felon, and (3) the firearm is operable.[6] The defendant disputes only whether she "possessed" the firearm for purposes of § 53a-217 (a).

" 'Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property . . . ." General Statutes § 53a-3 (2). Therefore, possession may be actual or constructive. See, e.g., *State* v. *Butler*, 296 Conn. 62, 77, 993 A.2d 970 (2010). This court consistently has held that constructive possession is "possession without direct physical contact." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 58, 111 A.3d 436 (2015). It can mean "an appreciable ability to guide the destiny of the [contraband]"; (internal quotation marks omitted) id., 62; and "contemplates a continuing relationship between the controlling entity and the object being controlled. Webster's Third New International Dictionary defines the noun 'control' as the '*power or authority to guide or manage.*' . . . [It] is not the manifestation of an act of control but instead it is the act of being in a *position of control* coupled with the requisite mental intent. . . . [T]his control must be exercised intentionally and with knowledge of the character of the controlled object." (Emphasis added.) *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986).

In particular, and important to the defendant's claim, we have observed that "[i]ntent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *James E.*, supra, 327 Conn. 218. So, too, can knowledge of the contraband and an intent to control it be inferred. See *State* v. *Simino*, 200 Conn. 113, 119, 509 A.2d 1039 (1986) (knowledge is "[o]rdinarily" inferred). However, "mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession . . . . [T]he government is required to present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 316 Conn. 62. Under the doctrine of nonexclusive possession, more than one person can possess contraband. *State* v. *Williams*, 258 Conn. 1, 7, 778 A.2d 186 (2001). However, "[w]here the defendant is not in exclusive possession of the premises where the [contraband is]

found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) Id.

2

Notably, the defendant has not raised a claim of vagueness or instructional error. See *State* v. *Luurtsema*, 262 Conn. 179, 204, 811 A.2d 223 (2002) (declining to address potential vagueness challenge to criminal statute because "defendant has attacked only the sufficiency of the evidence . . . without reference whatsoever to the constitutionality of the . . . statute"), overruled in part on other grounds by *State* v. *Salamon*, 287 Conn. 509, 513–14, 949 A.2d 1092 (2008). She also does not argue, even with respect to her insufficiency claim, that this court should revisit the definition of "constructive possession" that we consistently have applied. In fact, the language we cite appears almost verbatim throughout her brief, which is consistent with both the statutory definition of possession in our Penal Code; General Statutes § 53a-3 (2); and with our prior decisions interpreting that definition, which were based on our well settled principles of statutory interpretation. See, e.g., *State* v. *Hill*, supra, 201 Conn. 516 (defining "control" under § 53a-3 (2) as "power or authority to guide or manage" (internal quotation marks omitted)).[7] In addressing the jury, the prosecutor, defense counsel, and the trial court all referred to this as the practical ability of the defendant to "go and get" the gun, or the practical ability to obtain actual physical possession of it. Defense counsel made the defendant's physical access to the gun the sole point of his closing argument, focusing specifically and exclusively on whether the gun "was in a place where the defendant could, if she wishes, go and get it . . . ."[8] The prosecutor responded to defense counsel in rebuttal argument,[9] and the court instructed the jury on this theory.[10]

We agree with the United States Court of Appeals for the District of Columbia Circuit that this standard appropriately accounts for the deference we must afford to the jury and the practical problems of proof in the nonexclusive possession context: "[W]e would adhere to that concept in preference to artificial rules restricting evidence-sufficiency rules that would inevitably invade the traditional province of the jury . . . . The judge's task intensifies . . . when the accused's relationship to the premises is shared with others, and consequently the problems of knowledge and control intensify. . . . [I]n full recognition of the increased difficulties that the [g]overnment then faces, we reiterate that the sufficiency of the evidence for jury consideration depends upon its capability plausibly to suggest the likelihood that in some discernible fashion the accused had a *substantial voice vis-à-vis* the [contra-

band].” (Emphasis added; footnotes omitted.) *United States* v. *Staten*, 581 F.2d 878, 883–84 (D.C. Cir. 1978). Because the defendant has not asked us to depart from it, and because we are bound by our legislature’s definitions and prior decisions of this court, we adhere to our settled understanding of constructive possession.

B

With respect to the facts of the present case, the defendant’s challenge is to the sufficiency of the evidence in accordance with established Connecticut law. The record clearly entitled the jury to find that the defendant possessed the car she was driving.[11] Thus, the issue is whether it was reasonable for the jury to infer that she also possessed the firearm within the car.

A case for constructive possession of a firearm often is necessarily built on inferences, and a jury “may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical.” (Internal quotation marks omitted.) *State* v. *James E.*, supra, 327 Conn. 218. A jury also “may draw factual inferences on the basis of already inferred facts.” (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 670, 31 A.3d 1012 (2011).

The “line between permissible inference and impermissible speculation is not always easy to discern.” (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 768, 36 A.3d 670 (2012). “[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis,” but it must suffice to produce “in the mind of the trier a reasonable belief in the probability of the existence of the material fact.” (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000). “When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment.” (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 768–69. We therefore also must bear in mind that “jurors are not expected to lay aside matters of common knowledge or their own observations and experiences . . . . [C]ommon sense does not take flight when one enters a courtroom.” (Citation omitted; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 70 n.17, 43 A.3d 629 (2012).

Our review of the evidence finds several “circum-

stances tending to buttress . . . an inference"; (internal quotation marks omitted) *State* v. *Williams*, supra, 258 Conn. 7; that the defendant had the knowledge of and intent to control the firearm that our law requires for a finding of constructive possession, including facts and inferences that reasonably permitted the jury to conclude that, in all probability, she had the ability to "go and get" the gun.

1

There was no serious argument at trial that the defendant lacked knowledge of the gun. At the very least, the jury reasonably could have inferred from the evidence that, by the time of the car chase, the defendant knew that a gun was in the vehicle. Spann exited the car openly carrying the firearm in his hand and fired multiple gunshots within no more than twenty feet of the car. In his testimony, Spann acknowledged that the defendant "[p]robably" heard the gunshots.[12] Spann also testified that he got back into the car with the gun. Spann's testimony was corroborated, in part, by the testimony of the police officers who witnessed the shooting and testified that, immediately after firing his weapon, Spann entered the vehicle.

Additionally, the defendant likely knew Spann was a drug dealer and, therefore, that he often carried a gun. See, e.g., *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001) ("Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms" (internal quotation marks omitted)). The jury is permitted to "rely on its common sense, experience and knowledge of human nature in drawing inferences"; *State* v. *Rodgers*, 198 Conn. 53, 59, 502 A.2d 360 (1985); and "may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 670. On the basis of the defendant's knowledge that Spann was a drug dealer who often carried a gun, it was not "so unreasonable [an inference] as to be unjustifiable" for the jury to infer that she knew that he possessed a gun in the car. (Internal quotation marks omitted.) Id. This evidence and the inferences that reasonably could be drawn therefrom make it impossible for this court to conclude that "no reasonable jury" could have found that the defendant had knowledge of the gun. Thus, the jury reasonably could have inferred that, at the very least, the defendant became aware that the firearm was in the car after the shooting.

2

Our review of the record in the light most favorable to sustaining the verdict leads us to find at least four circumstances, which the jury could have reasonably relied on, that "tend[ed] to buttress . . . an inference"; (internal quotation marks omitted) *State* v. *Williams*, supra, 258 Conn. 7; that the defendant was intentionally

"in a position of control" over the gun; *State* v. *Hill*, supra, 201 Conn. 516; or did exercise control over the gun: her control of the car, her flight from the police, her relationship with Spann, and her physical access to the gun. We discuss each in turn.

First, the fact that the defendant was driving, and thereby controlling, the car that she knew contained the gun suggests that she was able to and intended to control the gun. Although we are mindful that "mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession"[13] and that "some connection or nexus individually linking the defendant to the contraband" is required; (internal quotation marks omitted) *State* v. *Johnson*, supra, 316 Conn. 62; the facts and circumstances of this case provided the jury with ample justification to conclude that the defendant's control of the car, at least in part, supported the jury's conclusion that she also controlled the firearm. Coupled with other evidence, "[o]ne who owns or exercises dominion or control over a motor vehicle in which [contraband] is concealed may be deemed to possess the contraband." (Internal quotation marks omitted.) *State* v. *Delossantos*, 211 Conn. 258, 277–78, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); see, e.g., *State* v. *Winfrey*, 302 Conn. 195, 211, 24 A.3d 1218 (2011) (fact that defendant was driving vehicle in which contraband was found supported inference of constructive possession of that contraband); *State* v. *Bowens*, 118 Conn. App. 112, 123, 982 A.2d 1089 (2009) ("defendant was driving the [car] containing the revolver, which itself suggests control of the firearm"), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010); *State* v. *Sanchez*, 75 Conn. App. 223, 241, 815 A.2d 242 ("[t]he drugs were found in a car [the defendant] was operating and, thus, had control over"), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003).

Second, after Spann had discharged the weapon, the defendant attempted to evade the police, who had begun pursuit, first in the car and then on foot. The jury reasonably could have found that these attempts at flight, coming right after Spann had fired the gun and gotten back in the car, indicated a consciousness of guilt stemming from her knowledge of and intent to exercise control over the gun, leading the jury to find that she possessed it. Specifically, the jury reasonably could have inferred that her maneuver around the patrol car and the ensuing car chase were deliberate—and successful—efforts to prevent the police from finding the firearm and, thus, exertions of dominion or control over it. See, e.g., *State* v. *Butler*, supra, 296 Conn. 79 (defendant's effort to "conceal" contraband supported inference of control); *State* v. *Bowens*, supra, 118 Conn. App. 124 (defendant's effort to "jettison the revolver" supported inference of control); *United States* v. *Chambers*, 918 F.2d 1455, 1458 (9th Cir. 1990) ("[c]onduct by

the driver of a vehicle that appears intended to aid a passenger in disposing of the [contraband] is probative of joint possession”).

Notably, because of her prior felony convictions, the defendant had been expressly informed that it was illegal for her to possess a firearm[14]—a fact the prosecutor highlighted in his closing argument. The jury was asked to view the car chase in the context of the entire afternoon. Evidence about the periods before, during and after the car chase set forth throughout this opinion bolster the conclusion that the defendant—who disclaimed any argument that she acted under duress—was not just passively following orders when she sped away from the police, weaved around pedestrians, and passed multiple stop signs without stopping over the course of 1.2 miles. To the extent that the jury found her high-speed exit from the crime scene was an effort to escape capture, it reasonably could have inferred her consciousness of guilt on the basis of this evidence. See, e.g., *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986). “The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury.” (Internal quotation marks omitted.) Id. Particularly in light of her knowledge that it was illegal for her to possess a gun, it was reasonable for the jury to infer that the defendant’s flight was motivated by a belief that she had broken the law by possessing a gun and a desire to escape prosecution for it.

The concurring and dissenting justice takes issue with our conclusion that the record supports the jury’s reasonable reliance on the defendant’s flight as evidence supporting her intent to control the gun. He prefers his own alternative explanation for the defendant’s leading the police on a 1.2 mile high-speed car chase, ending in a crash after which the defendant and Spann fled on foot separately. We are told there are several more benign reasons for her flight, including that she was helping Spann, that she feared Spann, that she feared the police or that she was escaping before another crime she had committed was discovered.[15] Defense counsel argued some of these alternative explanations to the jury. In the concurring and dissenting justice’s view, the “least plausible” motive was a desire to exercise control over the gun. To judge the plausibility of these explanations, the concurring and dissenting justice relies on and credits the entirety of Spann’s testimony, which, as we explain in part I B 3 of this opinion, the jury was not required to credit. Even if the record supported the concurring and dissenting justice’s speculative accounting of the defendant’s actions, this court consistently has explained that the possibility of other, innocent “inferences from these facts is not sufficient to undermine [the jury’s] verdict . . . .” (Internal quotation marks omitted.) *State* v. *Otto*, supra, 305 Conn. 74. “[I]n viewing evidence [that] could yield

contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) Id.[16]

Third, the state's overarching theory of the whole case was that the defendant intended to facilitate the shooting by acting as Spann's getaway driver. The prosecutor specifically asked the jury to draw this inference on the basis of evidence of the defendant's yearslong friendship with Spann. The evidence was not just that she associated with a known criminal. Rather, she had made recent trips to the car rental agency with Spann. Spann trusted her enough to allow her to drive the car he rented in his name on the day of the incident.[17] Spann began shooting almost immediately upon getting out of the car, and the defendant waited for Spann to get back in the car after she witnessed the shooting and then drove him from the scene. She could have driven away without him. Instead, she fled from the police, both with Spann and then apart from him, after crashing the car.[18] From all of the evidence, the jury reasonably could have inferred that the defendant and Spann were not just close friends but willing partners in a joint criminal venture: specifically, that she was driving him and his weapon to and from the scene of a shooting. "[A] defendant's knowing participation in a joint criminal venture in which a particular firearm is intended to play a central part permits the jury to reasonably conclude that the defendant constructively possessed that gun. . . . This is true even if the defendant never intended to use the firearm [her]self . . . ." (Citation omitted.) *United States* v. *Perez*, 661 F.3d 568, 576–77 (11th Cir. 2011), cert. denied, 566 U.S. 952, 132 S. Ct. 1943, 182 L. Ed. 2d 799 (2012), and cert. denied sub nom. *Davila* v. *United States*, 568 U.S. 874, 133 S. Ct. 355, 184 L. Ed. 2d 133 (2012); see, e.g., *State* v. *Williams*, 110 Conn. App. 778, 789, 956 A.2d 1176 (driver's "complicity with the occupants of the car in a criminal enterprise" supported inference of constructive possession), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008); *Logan* v. *United States*, 489 A.2d 485, 492 (D.C. 1985) (evidence that driver "acted in concert" with passenger to dispose of firearm supported inference of constructive possession); *United States* v. *Chambers*, supra, 918 F.2d 1458 (driver's conduct "intended to aid a passenger," and "cooperating" with passenger with actual possession supported inference of constructive possession); *United States* v. *Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982) (evidence of "cooperative venture" and "working relationship" supported inference of constructive possession). That the defendant was the getaway driver, spiriting the gun and Spann away from the scene of the shooting, was a reasonable inference from these facts and supports a finding that the defendant intended to control the gun.[19]

Finally, the defendant sat within arm's reach of the

gun throughout the afternoon. Spann testified to this. He also testified that, after firing the gun, he brought it back into the car and sat in the front passenger seat during the car chase, taking the gun with him when he fled from the police on foot after the crash. The two officers who witnessed the shooting corroborated Spann's account, testifying that, after the car stopped, Spann exited the car, fired the gun almost immediately, and reentered the car. Despite the defendant's having Spann testify in her defense, there was never any evidence that the gun was anywhere other than in the area of the front seat, and, therefore, the jury reasonably could have inferred that she was physically "in a position of control" over it, given her proximity to the gun. *State* v. *Hill*, supra, 201 Conn. 516; cf. *State* v. *Boyd*, 115 Conn. App. 556, 568, 973 A.2d 138 (evidence that contraband was found " 'right at [defendant's] feet' " supported inference of constructive possession), cert. denied, 293 Conn. 912, 978 A.2d 1110 (2009); *State* v. *Williams*, supra, 110 Conn. App. 787–88 (evidence that contraband was "within arm's reach" of defendant supported inference of constructive possession). There was no evidence that the gun was anywhere other than in the front passenger seat area at all relevant times, and the defendant does not contend otherwise.

On the basis of these four inferences, we cannot conclude that "no reasonable jury" could have found that the defendant was in a position of control over the gun. The concurring and dissenting justice disagrees, arguing that there was no evidence of particular facts—such as that the defendant was involved in Spann's drug enterprise or that the defendant previously had handled the gun—that would have established a link between the defendant and the gun. Although such facts might have helped to establish constructive possession, the absence of this evidence does not require the conclusion that there was insufficient evidence. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 236, 215 A.3d 116 (2019) (although physical evidence linking defendant to murder would have made state's case stronger, lack of such evidence did not necessarily render state's case weak).

3

If the defendant were alone in the car and knew a gun was located in the front seat area—for example, if Spann had fired the gun and placed it under the passenger seat of the car, between the seats or in the trash receptacle of the passenger's door, but did not get in the car, and the defendant sped away—there would be no serious argument that the defendant could not "go and get" the gun and, therefore, that she possessed the gun. However, the defendant responds that Spann's testimony that he had exclusive possession of the gun prevented the jury from finding that she was in a position of control over the gun. Specifically, she contends that the pains Spann asserts he took to hide the gun

from her defeat the state's attempt to prove her guilty of the possession charge.

The defendant called Spann as a witness in an effort to exonerate her on the gun possession charge on the basis of his testimony that the gun was with him in the front passenger seat and in his exclusive possession during the entire ninety minutes he and the defendant were in the car before the shooting, as well as after the shooting. Specifically, Spann testified that he actively hid or kept the gun from the defendant all afternoon by sitting on it, holding it or keeping it next to him between the seat and the passenger's side door. The jury did not have to credit this evidence, however, which was based entirely on the testimony of an unreliable witness and was at odds with the rest of the evidence of the day's events and the relationship between Spann and the defendant, which suggested that their interests were aligned.

In fact, staking the success of her defense on Spann's testimony could very well have backfired on the defendant. Spann's testimony can be seen as a textbook example of a case of a jury exercising its prerogative to "credit part of a witness' testimony and [to] reject other parts." *Hicks* v. *State*, 287 Conn. 421, 435, 948 A.2d 982 (2008). Specifically, the jury was entitled to credit Spann's testimony that the gun was located in the area of the front seat while discrediting his claims that he physically held the gun in a way that prevented the defendant from accessing it, such as by keeping it hidden "under [his] lap" the whole time or by holding it "on the side of [him] . . . in between the seat and the door" during the car chase.

Spann was hardly a credible witness. The jury heard that he previously had lied to the police about the incident (e.g., his false claim that the Impala had been stolen) and heard about his potential biases (e.g., that he only came forward to exonerate the defendant after his own conviction and sentencing and, thus, testified without the threat of additional criminal exposure). The jury also heard several inconsistencies within his own testimony (e.g., his inconsistent responses about whether the defendant knew he had a gun) and the contradictory testimony of other witnesses (e.g., his testimony that he fired the gunshots five to ten minutes after getting out of the car against the testimony of two police officers that he fired almost immediately after getting out of the car). The jury repeatedly was made aware of these credibility issues throughout the questioning and reminded of them during the prosecutor's summations.

The jury had good reason to question Spann's credibility: it reasonably could have found his testimony evasive or, at best, ambiguous,[20] and his story about the gun's location not just unbelievable and uncorroborated, but risible. His tale seeking to exonerate the

defendant, including his claim that, for the ninety minutes he was with the defendant in the car that day, he assiduously kept the gun where she could not get it, including by sitting on it for stretches of time, strained credibility. Given their relationship, the jury was entitled to view this explanation with skepticism.[21]

This is an excellent example of why we repeatedly admonish appellate courts to leave credibility determinations to the jury and not become a " 'seventh juror' . . . ." *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); see id. ("[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence"). The prosecutor's examination is peppered with frustration and acerbic exchanges as Spann engaged in evasion, sarcasm or flippancy, or so the jury reasonably could have found. In relevant part, the transcript reads:

"Q. All right. Now, you're familiar with the sound that firearms make, correct?

"A. Mm-hmm.

"Q. And you'd agree that from twenty feet away, you can hear a nine millimeter being fired?

"A. *Probably.*

"Q. All right. So, you fired the shots and then get back in the car?

"A. Yeah.

"Q. And when you get back in the car, the gun's not underneath your—your—the gun's in your hand, still, when you get back in the car?

"A. Yeah.

"Q. So, at that point, [the defendant] knows you have a gun? Right?

"A. Well—

"Q. It's a yes or no question.

"A. *Maybe.*

"Q. *Come on. You just fired two or three shots*, you get back in the car, you're yelling at her to go—

"A. I wasn't yelling—

"Q. You—she knows what you do for a living, right?

"A. I mean, I didn't yell at her.

"Q. But she knows what you do for a living, right?

"A. Say that again.

"Q. She knows what you do for a living?

"A. *Maybe.*" (Emphasis added.)

The reader can be forgiven for imagining the jurors' eyes rolling during this exchange.[22]

In considering this testimony, which the defendant

advanced for the jury's consideration, the jury reasonably could have questioned why Spann would go to such lengths to prevent her from having access to the gun. Was he afraid she would use the gun on him? There was no evidence of this. Was he anticipating getting caught and wanting to ensure that she had no criminal liability, or that he would? Using common sense, as the state urged in evaluating this after-the-fact,[23] concocted story, the jury could have rejected that he was that noble,[24] or prescient. In fact, that Spann would have felt the need to hide or keep the gun from the defendant is at odds with evidence suggesting that his and the defendant's interests were aligned. For example, the jury heard that Spann and the defendant had a yearslong friendship; they had recently gone to the car rental agency together at least once and possibly multiple times regarding the Impala; Spann knew where the defendant lived and drove there to pick her up; Spann trusted the defendant enough to let her drive a car rented in his name; Spann and the defendant had spent the previous ninety minutes together in the car; and the defendant waited for Spann to get back in the car after the shooting before fleeing from the police. Conversely, no evidence (other than Spann's claims) suggested that he would have felt the need to keep or hide the gun from the defendant.

If the jury in fact rejected Spann's uncorroborated claim of exclusive possession, not believing that for every moment of the afternoon Spann was carefully holding, sitting on, or secreting the gun in a fashion so that the defendant was never in a position to go and get it, it remains unrefuted that the gun was in the front passenger compartment of the car, within arm's reach of the defendant. Surely, the jury was not compelled to conclude that the gun magically disappeared just because it disbelieved Spann's story of his own exclusive possession. The jury was therefore entitled to infer that the defendant would have had access to and control over it.[25]

Thus, under this court's definition of "possession," and viewing the evidence in the light most favorable to sustaining the verdict, as we must, we conclude that the facts and inferences reasonably drawn from these facts sufficiently established the defendant's constructive possession of the firearm beyond a reasonable doubt. "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal." (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 330 Conn. 187. The defendant, the prosecutor and the court each asked the jury to consider whether the defendant could "go and get" the gun. The jury concluded that she could. There is certainly "a reasonable view of the evidence" that

supports this conclusion. (Internal quotation marks omitted.) *State* v. *Taupier*, supra, 187. Therefore, we affirm her conviction of criminal possession of a firearm.

## C

Alternatively, the defendant argues that the nonexclusive possession doctrine does not apply in this case because Spann actually possessed the firearm. She maintains that actual possession is exclusive—that is, if one party has actual possession, another party may not also have constructive possession. She cites no authority for this proposition, however, basing this argument on the fact that no Connecticut court has yet applied the doctrine in a scenario involving a third party who actually possessed the firearm. She notes that Connecticut courts have applied the nonexclusive possession doctrine only in situations in which the firearm was unattended or there was evidence that the defendant had actually possessed it previously.

We decline to adopt the defendant's position. Even if we assume that Spann actually possessed the firearm for the entire afternoon—which the parties dispute, which the jury may very well have rejected, and which we do not decide—we find nothing in the doctrine itself, its policy, or its application in this or other jurisdictions to suggest that it is limited to cases involving constructive possessors only. As a general concept in our criminal law, "[p]ossession may be joint as where two or more persons have dominion and control over the articles involved and where such persons are all acting at the time pursuant to a common purpose." (Internal quotation marks omitted.) *State* v. *Gabriel*, 192 Conn. 405, 422–23, 473 A.2d 300 (1984). More specifically, this court has tacitly recognized on at least one occasion that "circumstances tending to buttress . . . an inference" of constructive possession; (internal quotation marks omitted) *State* v. *Williams*, supra, 258 Conn. 7; may arise regardless of who physically holds contraband at a given time, citing favorably to a case in which a defendant constructively possessed contraband when she drove a vehicle but a third party "sitting beside her, had the [contraband] in a gym bag . . . ." *United States* v. *Crockett*, 813 F.2d 1310, 1316 (4th Cir.) (cited by *State* v. *Delossantos*, supra, 211 Conn. 278), cert. denied, 484 U.S. 834, 108 S. Ct. 112, 98 L. Ed. 2d 71 (1987), and cert. denied sub nom. *Crews* v. *United States*, 484 U.S. 834, 108 S. Ct. 112, 98 L. Ed. 2d 71 (1987).

Outside of Connecticut, courts have applied the nonexclusive possession doctrine in scenarios similar to the present case—namely, to hold that a driver constructively possessed a firearm held by a passenger. E.g., *United States* v. *Richardson*, Docket No. 87-5006, 1987 WL 38924, *3 (4th Cir. November 2, 1987); *Logan* v. *United States*, supra, 489 A.2d 492. Other courts have gone further, holding that a defendant constructively

possessed a firearm even though someone else held it *and* the defendant lacked *any* physical connection to it. See, e.g., *People* v. *Casanas*, 170 App. Div. 2d 257, 258, 566 N.Y.S.2d 7 (defendant constructively possessed firearm pointed at victim by codefendant during robbery because "[codefendant's] display of the weapon was part of the original robbery plan"), appeal denied, 77 N.Y.2d 959, 573 N.E.2d 581, 570 N.Y.S.2d 493 (1991); *State* v. *Jennings*, 335 S.C. 82, 87, 515 S.E.2d 107 (App. 1999) (defendant constructively possessed firearm used by friend during robbery because he "directed" and "instructed" friend to retrieve it, display it during robbery, and hide it after robbery). Accordingly, we reject the defendant's argument and affirm the conviction of criminal possession of a firearm.

II

The defendant's second claim on appeal is that there was insufficient evidence to support her conviction of having a weapon in a motor vehicle in violation of § 29-38 (a). A person who "knowingly has" a weapon in a vehicle without a permit is guilty of violating that statute.[26] The defendant argues that, contrary to the legislature's intent, Connecticut courts have misconstrued the phrase "knowingly has" to criminalize mere knowledge of a firearm's presence in a vehicle "owned, operated or occupied by" the defendant. This construction has arisen from the Appellate Court's interpretation of the statute in *State* v. *Mebane*, 17 Conn. App. 243, 551 A.2d 1268, cert. denied, 210 Conn. 811, 556 A.2d 609, cert. denied, 492 U.S. 919, 109 S. Ct. 3245, 106 L. Ed. 2d 591 (1989). In *Mebane*, a defendant convicted under General Statutes (Rev. to 1985) § 29-38 argued that the jury should have been instructed that "knowingly has" meant "knowingly possesses . . . ." (Internal quotation marks omitted.) Id., 245. The court declined to "limit the scope of the statute" in this way, reasoning: "The statute is not concerned with possession or ownership of a weapon, but rather aims to penalize those who know that there is a weapon inside a motor vehicle." Id., 246.

The defendant now asks this court to overrule *Mebane* and to interpret "knowingly has" to mean "knowingly possesses." She thereby argues that her conviction must be reversed for insufficient evidence, on the basis of her mere knowledge of the firearm's presence in the Impala. Relying on the same grounds, she alternatively raises claims of instructional error and plain error; see Practice Book § 60-5; and asks this court to exercise its supervisory authority over the administration of justice to reverse her conviction.

Even if we were to assume, without deciding, that "knowingly has" means "knowingly possesses," constructive possession of a firearm would support a conviction even under the defendant's proposed reading of the statute. As set forth in part I of this opinion,

possession may be actual or constructive, with constructive possession requiring knowledge and control of the object. Because knowledge is a necessary element of constructive possession, a person who constructively possesses an object also knowingly possesses it. Thus, in light of our conclusion that there was sufficient evidence that the defendant constructively possessed a firearm in connection with her conviction under § 53a-217 (a), we reach the same conclusion to support her conviction under § 29-38 (a).

Similarly, the jury's finding that the defendant constructively possessed a firearm under § 53a-217 (a) renders any potential instructional error harmless. Nor do we find plain error in the proper application of the law existing at the time of trial, which was the construction announced in *Mebane*. See *State* v. *Turner*, 334 Conn. 660, 684, 224 A.3d 129 (2020) (it is axiomatic that proper application of law existing at time of trial cannot constitute reversible error under plain error doctrine); *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011) (same). Finally, recognizing that the exercise of our supervisory authority over the administration of justice is generally reserved for the adoption of procedural rules, we decline to exercise it to resolve this issue of statutory construction and evidentiary sufficiency. See, e.g., *In re Yasiel R.*, 317 Conn. 773, 790–91, 120 A.3d 1188 (2015) (adopting procedural safeguard requiring trial courts to canvass parents who do not consent to termination of their parental rights prior to start of termination trial to ensure fairness). Therefore, we affirm the conviction without reaching the merits of the defendant's argument.

The judgment is affirmed.

In this opinion MULLINS, VERTEFEUILLE and PRESCOTT, Js., concurred.

* This case was originally argued before a panel of this court consisting of Justices Palmer, McDonald, D'Auria, Mullins, Ecker and Vertefeuille. Thereafter, Judge Prescott was added to the panel and has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

** March 27, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Hereinafter, all references to § 53a-217 are to the 2013 revision.

[2] Hereinafter, all references to § 29-38 are to the 2013 revision.

[3] Pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a defendant who enters a guilty plea does not admit guilt but, rather, acknowledges that the state's case is so strong that he is willing to enter a plea of guilty.

[4] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] The defendant does not challenge her conviction of using a motor vehicle without the owner's permission and reckless driving.

[6] General Statutes (Rev. to 2013) § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm or electronic defense weapon when such person possesses a firearm or electronic defense weapon and . . . has been convicted of a felony . . . ."

[7] In *State* v. *Hill*, supra, 201 Conn. 505, we went on to conclude: "The New York construction of an identical statute, however, combined with our

approval of the same interpretation in a related context . . . and the common usage of the phrase 'to exercise dominion or control,' ineluctably lead[s] us to conclude that the trial judge's instructions in the present case were not erroneous." (Citation omitted.) Id., 517; see also *People* v. *Manini*, 79 N.Y.2d 561, 573, 594 N.E.2d 563, 584 N.Y.S.2d 282 (1992) ("the [p]eople must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found"); *United States* v. *Brown*, 422 F.3d 689, 692 (8th Cir. 2005) ("[c]onstructive possession of the firearm is established if the defendant [had] dominion over the premises where the firearm was located" (internal quotation marks omitted)).

[8] In his closing argument, defense counsel made the following statements about the defendant's physical access to the gun: "As long as the object is or was in a place where the defendant could, if she wishes, could go and get it, it is in her possession"; "[the defendant has constructive possession] [a]s long as the object is or was in a place where the defendant, if she wishes to, could go and get it"; "could [the defendant] get that gun?"; "[t]here's no information that was presented to you that . . . she can go and get it"; and, "[d]o you think that [Spann] would relinquish that weapon?"

[9] In his rebuttal argument, the prosecutor stated: "It's a Chevy Impala, this is not—it's a limited space. You have pictures of the car. Could she get it? It's right there in the car where she is. She's—she can exercise dominion and control within this relatively small space of the interior of the Chevy Impala."

[10] The court instructed the jury in part: "As long as the object is or was in a place where the defendant could, if she wishes, go and get it, it is in her possession"; the court repeated the instruction after a question from the jury during its deliberations.

[11] Apart from disputing her intent to control the firearm, the defendant appears to argue that she even may have lacked the intent to control the car during the chase. At trial, her counsel argued to the jury that she merely was following Spann's orders to drive away from the shooting. Similarly, in her reply brief and at oral argument before this court, her appellate counsel argued that she had no choice but to drive away after the shooting out of fear for her personal safety. The defendant did not raise the affirmative defense of duress in the trial court, however, and, in fact, specifically disclaimed it. The trial court therefore did not instruct the jury on duress. We are not bound to consider a claim not raised until the defendant's reply brief and oral argument. See *State* v. *Jose G.*, 290 Conn. 331, 341 n.8, 963 A.2d 42 (2009); *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Nonetheless, her counsel argued to the jury that she was merely following Spann's orders to drive away from the shooting. The jury quite clearly rejected this argument. At any rate, the issue of intent to control the gun pervaded the trial and was for the jury to determine. Given that she continued to drive the car after the shooting until it crashed, we are not persuaded that the evidence, viewed in the light most favorable to sustaining the verdict, prevented the jury from rejecting the argument that she was acting strictly at Spann's behest and finding instead that she intended to control the car.

[12] It is undisputed that Spann fired the gun after exiting the car, but he and other witnesses gave conflicting accounts of the details. According to Spann himself, he exited the Impala with the gun in his hand, walked behind the car, and spoke to some acquaintances for five to ten minutes. Then, standing about twenty feet from the car, he fired two or three gunshots up in the air, then "[c]almly, coolly" walked to the car, and got back in. Although Spann testified that the defendant "[p]robably" heard the gunshots and was "shocked" when he reentered the car, he initially claimed that she did not know he was carrying a gun at this point. Later in his testimony, however, he conceded that "[m]aybe" the defendant knew he had a gun by this time.

Three witnesses contradicted the specifics of Spann's story. Two Bridgeport police officers each claimed to have witnessed the shooting from a patrol car parked a few buildings away from where the defendant stopped the car. They testified that Spann fired almost immediately after getting out of the Impala, that he was only a few steps outside of the car when he did so, that he aimed toward either a crowd of people or a building, and that he fired five gunshots. The third witness, a forensics expert, confirmed that five shell casings were found at the scene and that each had been fired from the same nine millimeter semiautomatic handgun. He did not testify as to whether the casings were fired specifically from Spann's gun, presumably because the gun was never recovered. The jury reasonably could have chosen

to believe these witnesses instead of Spann.

[13] Our conclusion on these facts does not suggest that the driver of a vehicle is deemed to be in constructive possession of every item she knows to be in a passenger's actual possession. Intent to control *contraband*—an element of constructive possession in Connecticut—may not be inferred "unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 258 Conn. 7. Driving the vehicle in which the contraband is located is *one* such circumstance, but we have not suggested that it is dispositive. See, e.g., *State* v. *Martin*, 285 Conn. 135, 149–50, 939 A.2d 524 ("[o]ne factor that may be considered in determining whether a defendant is in constructive possession of [contraband] is whether he is in possession of the premises where the [contraband is] found" (internal quotation marks omitted)), cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008).

In the present case, additional circumstances under which the defendant operated the vehicle—most notably, that she drove the vehicle to the place where Spann discharged the gun, waited for him to get back in the vehicle with the gun after the shooting, notwithstanding that she was a felon, and drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest for her participation in the shooting—in our view clearly buttressed an inference of an intent to control the gun contained within the vehicle but perhaps would not support an intent to control, for instance, Spann's cell phone or wallet.

[14] The shooting involved in this case is an excellent example of the reasons supporting the legislature's proscription of felons exercising control over guns.

[15] Without a hint of irony, the concurring and dissenting justice suggests that, after the defendant's friend, Spann, fired several gunshots on a city street, the defendant led the police on a dangerous high-speed chase because she was worried she might get pinched for unlawfully driving a car she had not rented herself.

[16] In support of his argument about flight, the concurring and dissenting justice cites *Alberty* v. *United States*, 162 U.S. 499, 510, 16 S. Ct. 864, 40 L. Ed. 1051 (1896), for the proposition that, when there are " 'so many reasons' " for the defendant's flight, evidence of flight does not establish guilt. *Alberty* is distinguishable. It was not a sufficiency of the evidence case. Rather, it concerned a jury instruction that "created a legal presumption of guilt so strong and so conclusive that it was the duty of the jury to act on it as axiomatic truth . . . ." Id. There was no such instruction given or challenged in this case. In fact, the concurring and dissenting justice quotes selectively from *Alberty*, which recognized that the weight of flight evidence is up to the jury: "[B]ut [flight] and similar evidence has been allowed upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances." (Internal quotation marks omitted.) Id. In the present case, the jury was instructed consistent with the holding in *Alberty*: "The [s]tate claims that the defendant fled from the scene of the shooting, that she engaged in a police pursuit, and ran from the vehicle . . . . It is for you to decide what that conduct was and what the defendant's purpose or reason was for acting as she did."

[17] Applying its common sense, the jury likely knew that most rental agreements do not permit a person to drive a car rented in another's name. The jury heard evidence that this rental agreement was no exception.

[18] Critical to his insufficiency point, the concurring and dissenting justice insists that the state did not argue its getaway driver theory to the jury on the gun possession charge but only on the attempted assault charge. He attempts to use the jury's acquittal of the defendant on the attempted assault charge to suggest that the jury did not find, on the basis of the evidence of the defendant's close relationship with Spann, that the defendant was the getaway driver as support for its determination that the defendant constructively possessed the gun. This ignores the record and a fundamental maxim of appellate review.

The trial court bifurcated the trial, submitting the criminal possession charge to the jury after it had returned a verdict on the other charges, including finding the defendant not guilty on the charges of attempted assault and interfering with a police officer. Although the prosecutor specifically made the getaway driver argument in his closing relating to the charges the jury first considered, and did not directly repeat it in his closing argument relating to the possession charge, he did argue in connection with the possession charge that the defendant was "well aware of the gun . . . before the shots were discharged" and that the jury could find joint possession,

both of which suggest that the shooting was a collaborative effort. Moreover, the prosecutor and the court both noted that the jury could rely on evidence from the first portion of the trial. Forced to admit that it was "not impossible" for the jury to have arrived at what the concurring and dissenting justice contends were inconsistent verdicts, the concurring and dissenting justice nonetheless insists that it was "unlikely, to say the least . . . ." But when we read the record in the light most favorable to sustaining the jury's verdict, the acquittal on the attempted assault charge was not at all factually inconsistent with the jury's guilty verdict on the possession charge, and surely not far-fetched. In fact, there is good reason to believe the jury did just as defense counsel implored it to do on the attempted assault charge, the most serious of the charges the defendant faced: found her not guilty for lack of intent, not because she was not the getaway driver.

An element of assault is intent to cause serious physical injury to another person. See General Statutes § 53a-59 (a) (1). Witnesses to the shooting gave conflicting testimony about where Spann was aiming when he fired the gun. The testimony of the two witnessing police officers was substantially similar in almost all respects but differed on this point—one officer said that Spann fired his gun in the direction of several pedestrians on the sidewalk; the other said that Spann fired toward a building. Spann himself testified that he fired up in the air. See footnote 12 of this opinion. This is not a testimonial discrepancy of an alternative theory the state would be expected to argue to the jury concerning the attempted assault charge— which exposed the defendant to the longest sentence among all of the charges. But defense counsel did make this very argument, underscoring this evidentiary discrepancy to the jury in closing, along with the absence of other eyewitness and forensic evidence of where Spann was aiming.

Finally, factually inconsistent jury verdicts are not just permissible, but unreviewable. See, e.g., *State* v. *Arroyo*, 292 Conn. 558, 585–86, 973 A.2d 1254 (2009) (claims of factual, logical and legal inconsistency between conviction and acquittal are not reviewable), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). Rather, a court reviewing the sufficiency of the evidence on one count "should examine only whether the evidence provided sufficient support for the conviction, and not whether the conviction could be squared with verdicts on other counts." *State* v. *Blaine*, 168 Conn. App. 505, 512, 147 A.3d 1044 (2016), remanded in part on other grounds, 325 Conn. 918, 163 A.3d 618 (2017); see *State* v. *Arroyo*, supra, 576–83. The main thesis of the concurring and dissenting justice's alternative narrative—that the jury must have rejected the getaway driver theory in finding the defendant not guilty on the attempted assault charge—conflicts with this elementary rule. On this record, the jury reasonably could have concluded that the state failed to prove beyond a reasonable doubt that, like Spann, the defendant had the intent to cause serious physical injury to another person while still concluding that she and Spann brought the gun to Trumbull Avenue for the purpose of firing it and that the defendant would serve as the getaway driver. But regardless, that is not a question appropriately before us. The only question we may examine is whether there was sufficient evidence for the jury to have found the defendant guilty on the criminal possession charge.

[19] Possession under these circumstances does not depend on a criminal conviction of a related offense. But, even if it did, the defendant was in fact convicted of related criminal offenses directly or indirectly involving the gun: having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving.

[20] Spann's testimony that the gun was between his passenger seat and the side door during the car chase was ambiguous as to whether he was physically holding the gun. The following colloquy occurred during the prosecutor's cross-examination of Spann:

"Q. All right. So, you fire off these shots. You agree the noise is so much she would have heard. You get back in the car, tell her to go, go, go. And the gun's still in your hand?

"A. It was on the side of me.

"Q. It's in your hand, it's not underneath you like it was when you were driving around for forty-five minutes with the gun under your lap?

"A. No, it was on the side—it was on the side of the door. Like on the side—in between the seat and the door."

[21] Because the defendant—not the state—called Spann as a witness, this is not a case in which the danger arises that the state might make its case simply by "calling [its] adversary and arguing to the jury that he was not to be believed." *Janigan* v. *Taylor*, 344 F.2d 781, 784–85 (1st Cir.), cert.

denied, 382 U.S. 879, 86 S. Ct. 163, 15 L. Ed. 2d 120 (1965). This risk is the main justification for the rule, sometimes referred to as the "antithesis inference," that, when there is no "positive evidence" otherwise supporting the witness' testimony, the jury is not free to infer the opposite of what the witness testified simply because it disbelieved Spann. See, e.g., *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985); *Edwards* v. *Grace Hospital Society*, 130 Conn. 568, 575, 36 A.2d 273 (1944). That is not what occurred here. Spann himself indicated that the gun was located in a part of the car (the area of the front passenger seat) where the defendant could "go and get it" but for Spann's supposed efforts to prevent her from doing so. That was the "positive evidence." Spann's testimony that he immediately got back into the car after firing his weapon was corroborated by the police officers' testimony. The jury could have believed the "positive evidence" of the gun's location without believing Spann's account of his preventative efforts.

The other main reason for barring an antithesis inference is also absent here: reliance on demeanor evidence. If a jury concluded that a witness was lying on the basis of demeanor alone, and inferred the opposite of what the witness claimed, an appellate court would not be able to judge the sufficiency of that inference; on review, nothing in the record could support it. See *State* v. *Hart*, 221 Conn. 595, 605–606, 605 A.2d 1366 (1992) ("[o]ur rule barring the inference of the opposite of testimony . . . is an evidentiary issue concerning the proper method of measuring the sufficiency of the evidence" (citations omitted)). Here, however, we do not have to resort to Spann's demeanor for evidence of his lack of credibility. As previously discussed—and more importantly, in the transcript—the jury heard Spann admit that he had lied to the police about the same incident, admit that he had a motive to be untruthful, provide inconsistent responses to questioning, and contradict the testimony of other witnesses.

[22] Other examples of Spann's recalcitrance abound, making it hard to imagine that the jury believed much of his testimony in the defendant's defense. Here is one example the jury could have justifiably found to be not just eye-rolling but sidesplitting. Critical to Spann's exoneration of the defendant on the criminal possession charge was that she did not have physical access to the gun or, in the words of defense counsel and the jury instructions, that she could not "go and get it . . . ." So, Spann went to great lengths to insist there was no way the defendant could "go and get" the gun. The following colloquy occurred during the prosecutor's cross-examination of Spann:

"Q. Okay. So, after being out of the car for five to ten minutes, you then remove the nine millimeter from where you had it?

"A. I—I got—I removed it, when I got out of the car. When I got out [of] the car, I took it with me.

"Q. Oh, okay. So, it was not on your person in the car?

"A. It was under my lap, so, when I got out, I took it with me.

"Q. What do you mean, under your lap? You were sitting on it?

"A. Yeah.

"Q. You were sitting on a gun?

"A. Yeah.

"Q. That had to be uncomfortable?

"A. It's not that uncomfortable.

"Q. Driving around for forty-five minutes with a piece of metal under you?

"A. It's not that uncomfortable.

"Q. All right. So—so, you get out of the car and you have to reach back to get the gun off—off the seat?

"A. No.

"Q. Okay. And before you get out of the car, you have to reach under your lap to pull the gun out?

"A. No.

"Q. Hmm. All right. How does the gun then get from under your lap to into your hand?

"A. Open the door, and when I get out, I—it's all one motion. Just—

"Q. Okay.

"A. Yeah.

"Q. With your right hand?

"A. Yeah.

"Q. And then you put the gun in your waistband?

"A. I held it in my hand.

"Q. Okay. So, you get out of the car holding this gun in your hand?

"A. Yeah." (Emphasis added.)

The concurring and dissenting justice and the majority agree that identifying the line between fair inference and speculation is challenging. We obviously both believe that the other engages in speculation. Ironically, it is at this part of our opinion—where we recount in great detail Spann's *actual* testimony, not repackaged descriptions of his testimony—that we are accused of "appellate storytelling," "conjur[ing] a basis for the jury's verdict" and "engag[ing] in a fictional account of the jury's conduct . . . ." The objective reader will have to decide who is telling stories. The point our opinion emphasizes is that, reading the record in the light most favorable to sustaining the verdict, not this court but the *jury* had good reason to question Spann's credibility; the *jury* reasonably could have found Spann's testimony evasive, ambiguous, sarcastic or flippant; and the *jury* could have found his tale exculpating the defendant "risible." To accept Spann's testimony at face value, as the concurring and dissenting justice does, is simply to substitute a different account than the jury was entitled to believe. It is true that an inference is permissible only "if the evidence produces *in the mind of the trier* [*of fact*] a reasonable belief in the probability of the existence of the material fact." (Emphasis altered; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 97, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The key for an appellate court is that the "reasonable belief in the probability" of that fact is for the *trier* to determine. Appellate review of the trier's determination requires studied objectivity. Otherwise, we are simply substituting our view of probability for the trier's. Proof of a material fact "by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis." (Internal quotation marks omitted.) Id. Simply because an appellate court can conceive of other possible factual scenarios does not mean that the jury's determination crosses the line from inference into speculation. We may reverse only if the trier's determination of that probability is "so unreasonable [an inference] as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 670.

[23] As support that this version of events was concocted after the fact, immediately after the crash, Spann reported the car stolen to the Bridgeport Police Department. Spann admitted that he lied about the car being stolen. Spann also admitted that he never called the police to provide information that would have shielded the defendant from liability. For example, he never informed the police that the defendant did not know about the gun in the car and had nothing to do with the shooting.

[24] In fact, Spann wore his lack of altruism on his sleeve before the jury. Witness this exchange between the prosecutor and Spann about why, after Spann ditched the gun in a neighborhood yard while eluding the police, he did not go back and recover it or warn others:

"Q. Why didn't you tell anyone where you ditched the gun?

"A. Why?

"Q. I'm asking you why?

"A. Why would I do that?

"Q. Well, let's see, you just dropped a loaded firearm in a residential neighborhood. There could be children around. Don't you think it would be a good idea to let people know; hey, there's a loaded gun in a back-yard somewhere.

"A. It would be a good idea. But, I mean, I'm a criminal, that's not what I was thinking at the time."

[25] In *Henderson* v. *United States*, 575 U.S. 622, 135 S. Ct. 1780, 191 L. Ed. 2d 874 (2015), the United States Supreme Court defined control of firearms under the federal felon-in-possession statute, 18 U.S.C. § 922 (g), as "whether [a] felon will have the ability to use or direct the use of his firearms"; id., 630; and offered examples of when someone might have such control. Id., 630–31. The court stated that a felon could control guns that were actually possessed by a third party if the third party was not "independent of the felon's control"; id., 630; or would "allow the felon to exert any influence over [the guns'] use." Id. Here, the gun was in the actual possession of a third party, Spann. But, by allowing the defendant to drive while Spann had the gun, Spann was not "himself independent of [the defendant's] control" and did not prevent her from "exert[ing] any influence over [the gun's] use." Id.

On a record similar to this case, the United States Supreme Court viewed constructive possession consistently with our definition and application. In *Maryland* v. *Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003), the issue was whether the police had probable cause to arrest the defendant for constructive possession of cocaine. Id., 370. The defendant, sitting in

the front passenger seat of a car, was one of three occupants of a car the police stopped for speeding at about 3 a.m. Id., 368. Upon a search, the police found $763 in the glove compartment in front of the defendant and five bags of cocaine "behind the [backseat] armrest" next to another occupant; no occupant claimed possession of the cash or cocaine. Id. The court held: "We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." Id., 372. It added: "[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." (Internal quotation marks omitted.) Id., 373.

[26] General Statutes (Rev. to 2013) § 29-38 (a) provides in relevant part: "Any person who knowingly has, in any vehicle owned, operated or occupied by such person, any weapon, any pistol or revolver for which a proper permit has not been issued as provided in section 29-28 or any machine gun which has not been registered as required by section 53-202, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon, pistol or revolver, or machine gun in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. . . ."

The defendant claims that there was insufficient evidence only as to the "knowingly has" element. She does not argue that there was insufficient evidence to establish that a proper permit had not been issued. The jury heard uncontested evidence that neither Spann nor the defendant had a permit to carry a firearm.

_____